## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## (ALEXANDRIA DIVISION)

| | |
|---|---|
| EILEEN JOSEPH, AND<br>DANIEL WISHNATSKY,<br>individually and on behalf of others similarly<br>situated,<br><br>and<br><br>RANDALL BROOKS<br>as a member of the class,<br><br>                             Plaintiffs,<br><br>   v.<br><br>THE BUREAU OF NATIONAL AFFAIRS, INC.,<br>PAUL N. WOJCIK<br>GREGORY C. MCCAFFERY<br>PAUL A BLAKELY,<br>ELIZABETH WILDHACK, ESQ. AS EXECUTOR OF THE<br>ESTATE OF CYNTHIA J BOLBACH,<br>MARCIA P. KAPLAN,<br>GEORGE KORPHAGE,<br>EUNICE F. LIN,<br>DARREN P. MCKEWEN,<br>JONATHAN NEWCOMB,<br>GERALD HOBBS,<br>ELLEN TAUS,<br>DANIEL TOOHEY,<br>DAVID M. VICTOR,<br>NEIL FROEMMING, AND<br>ROBERT AMBROSINI<br><br>                         Defendants. | Civil Action No. 1:13cv 1056<br>                       LO/JFA<br><br><br><br>**Class Action Complaint**<br><br>(Jury Trial Demanded) |

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA
2013 AUG 23  P 2: 26
FILED

Plaintiffs Eileen Joseph and Daniel Wishnatsky, individually and on behalf of others

similarly situated, and Randall Brooks as a member of the proposed class (collectively

"Plaintiffs") by and through undersigned counsel, bring this suit for securities fraud under

Sections 10, 14, and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78j, 78n, and 78t.

1

## I.   SUMMARY OF THE ACTION

1.   This is a securities fraud class action brought against The Bureau of National Affairs, Inc.
("BNA" or the "Company") and certain of its officers and directors for violations of the
Exchange Act, on behalf of the shareholders of BNA who sold their shares of BNA stock
("Company Stock" or "Stock") back to the Company under the BNA Stock Purchase and
Transfer Plan ("SPTP") from March 21, 2011 through August 25, 2011 (the "Class
Period").

2.   At all times relevant to the claims asserted in this action, ownership of Company Stock
was limited to BNA's current and former employees.

3.   BNA's Board of Directors (the "Board") set the price of Company Stock at least twice a
year.  This generally occurred in March and September.

4.   On March 10, 2011, at the Board's regularly scheduled meeting, by invitation from the
Board, Evercore Group LLC ("Evercore"), an investment banking firm with which BNA
had an established relationship, made a presentation to the Board about the possible sale
of the Company.

5.   During the meeting, Evercore detailed for the Board the efforts already undertaken to
ready the Company for sale.  Evercore identified as in process, a draft offering
memorandum and a data room largely cleansed of BNA's older files and being updated to
contain BNA's key financial, business, and legal documents.

6.   Evercore informed the Board that these extensive advance preparations would probably
yield a definitive sale agreement within four months of initial calls being made to
bidders.

7.      Evercore also informed the Board that bidders would likely pay between $33 and $40 per share for the Company's Stock.

8.      Following Evercore's presentation, the Board expressed its support for Defendant Paul Wojcik, Chairman and Chief Executive Officer of BNA, to consider the process further relating to a potential sale of the Company.

9.      At this March 10, 2011 meeting, the Board then turned to the task of setting the price of Company Stock. The Board proceeded to set the Company Stock price at $17.50 per share — a price that failed to take into consideration the likely sale of the Company and the attendant valuation change, and that represented merely a one dollar increase over the price previously set by the Board on September 8, 2010 when the Board had determined to maintain the Company's long standing employee ownership status.

10.     At the March 10, 2011 meeting, the Board also voted to authorize the Company to repurchase Stock from shareholders at a price of $17.50 per share. This price was then communicated to shareholders in multiple ways — including via email, letter and a prospectus reviewed and issued by the Board — again failing to take into consideration the likely sale of the Company and the attendant valuation change.

11.     Between March 10, 2011 and August 25, 2011, the Defendants kept the impending sale of the Company a secret while BNA repurchased over 400,000 shares of Company Stock at $17.50 per share. Upon information and belief, approximately half of those shares were repurchased from unwitting Class members.

12.     On August 25, 2011, BNA announced that it had reached an agreement with Bloomberg Inc., ("Bloomberg") whereby Bloomberg would purchase all of the outstanding shares of Company Stock for $39.50 per share. This price was more than double what BNA had

paid to Class members for the Stock during the Class Period, and was at the highest end of the range of the expected purchase price presented by Evercore to the Board at that March 10, 2011 meeting.

13. The August 25, 2011 announcement of Bloomberg's offer to purchase BNA was the first public disclosure of the sale to all BNA shareholders.

14. During the period between the Board's setting of the price of the Stock on March 10, 2011, and the August 25, 2011 announcement of the sale of BNA to Bloomberg, none of the individuals named as Defendants in this action who owned Company Stock sold any of their Stock.

15. After the March 10, 2011 Board meeting, some of the Defendants named in this action acquired additional shares of Company Stock at the artificially low price of $17.50 per share, and a few months later tendered those shares to Bloomberg at $39.50 per share.

## II.  JURISDICTION AND VENUE

16. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 15 U.S.C. § 78aa.

17. This Court has personal jurisdiction pursuant to Rule 4(k)(1)(A), Fed. R. Civ. P. because all Defendants would be subject to the jurisdiction of a court of general jurisdiction in the state of Virginia.

18. Venue is proper in this Court pursuant to Section 27 of the Securities Exchange Act of 1934 and 28 U.S.C. § 1391(b) because: many of the acts complained of herein occurred in substantial part in the Eastern District of Virginia; the headquarters and principal place of business of Defendant The Bureau of National Affairs, Inc. ("BNA" or the

"Company") is in Virginia; and several of the defendants reside in the Eastern District of Virginia.

19.   In connection with the acts alleged in this lawsuit, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to the mails, to carry out their unlawful conduct in violation of applicable federal laws as set forth herein.

## III.   THE PARTIES

### A.   Plaintiffs

20.   Plaintiff Eileen Joseph is a former employee of BNA.  She was a BNA shareholder.  She retired from the Company in 2007 after 36 years of service.  During the Class Period, she sold 2500 shares of Stock to BNA at the artificially low price of $17.50 per share as stated in her certification filed with this Complaint.

21.   Plaintiff Daniel Wishnatsky is a former employee of BNA.  He was a BNA shareholder. He retired from the Company in 2001 after 22 years of service.  During the Class Period, he sold 1500 shares of Company Stock to BNA at the artificially low price of $17.50 per share as stated in his certification filed with this Complaint.

22.   Plaintiff Randall Brooks is a former employee of BNA.  He was a BNA shareholder.  He retired from the Company in 1987 after 22 years of service.  During the Class Period, he sold 66,580 shares of Company Stock to BNA at the artificially low price of $17.50 per share.

### B.   Defendants

23.   Defendant **BNA** is a Delaware corporation with its principal place of business in the state of Virginia.

5

24.   BNA was founded in 1929 and incorporated as an employee-owned company in 1946.

25.   As of August 31, 2011, it was the oldest fully employee-owned company in the United
      States.

26.   BNA currently is a wholly owned subsidiary of Bloomberg, Inc.

27.   BNA is a leading publisher of legal and regulatory information, including such
      publications as the Securities Law Daily and the Securities Regulation and Law Report.

28.   At all times relevant to the claims asserted in this action, BNA was subject to the
      informational and reporting requirements of the Exchange Act, and in accordance with
      the Exchange Act was required to file periodic reports, proxy statements and other
      information with the Securities and Exchange Commission relating to its business,
      financial condition, and other matters.

29.   At all times relevant to the claims asserted in this action, the structure of BNA's Board
      included a Chairman of the Board, a Vice Chairman of the Board, an Executive
      Committee, an Audit Committee, a Corporate Governance Committee, and an Executive
      Compensation Committee.

30.   At all times relevant to the claims asserted in this action, Defendant **Paul Wojcik** was the
      Chief Executive Officer of BNA, Chairman of the Board, a Director of the Company, and
      a member of the Board's Executive Committee. He began serving as a Director of the
      Company in 1989. As the Chief Executive Officer of BNA, his job was to focus on the
      overall strategic direction of the Company. He was actively involved in and exercised
      control over the day-to-day operations of the Company. As of August 24, 2011, he
      beneficially owned 200,996 shares of Company Stock or 2.09% of Class A shares.

31.   At all times relevant to the claims asserted in this action, Defendant **Gregory C. McCaffery** was the President and Chief Operating Officer of BNA, Vice Chairman of the Board, and a member of the Board's Executive Committee. He began serving as a Director of the Company in 1997. He was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, he beneficially owned 138,016 shares of Company Stock or 1.44% of Class A shares.

32.   At all times relevant, to the claims asserted in this action Defendant **Paul Blakely** was the Assistant Treasurer of BNA and a Director of the Company. He began serving as a Director of the Company in 2004. He was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, he beneficially owned 68,577 shares of Company Stock or 0.71% of Class A shares.

33.   At all times relevant to the claims asserted in this action, **Cynthia Bolbach** was Executive Vice President and Corporate Secretary of BNA, a Director of the Company and a member of the Board's Executive Committee. She began serving as a Director of the Company in 2001. She was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, she beneficially owned 49,145 shares of Company Stock or 0.51% of Class A shares.

34.   Cynthia Bolbach died on December 12, 2012. On December 20, 2012, Defendant Elizabeth Wildhack, Esq. was appointed the executor of the estate of Cynthia Bolbach by the Circuit Court of Arlington, Virginia. Plaintiffs name Elizabeth Wildhack, Esq. as executor of the estate of Cynthia Bolbach, as a defendant in this action.

35.   From April 16, 2011, through the end of the Class Period, Defendant **Marcia Kaplan** was a Senior Account Executive of BNA and a Director of the Company. She served as a

7

Director of the Company from 2008 to 2010, and was reelected as a Director on April 16, 2011. She was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, she beneficially owned 242,892 shares of Company Stock or 2.53% of Class A shares.

36.    At all times relevant to the claims asserted in this action, Defendant **George Korphage** was a Director of the Company. He began serving as a Director of the Company in 1988. Prior to his retirement from BNA in 2007, he had been the Chief Financial Officer of BNA. He was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, he beneficially owned 274,261 shares of Company Stock or 1.77% of Class B shares.

37.    At all times relevant to the claims asserted in this action, Defendant **Eunice Lin** was Executive Vice President and General Counsel of BNA, a Director of the Company, and a member of the Board's Executive Committee, She was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, she beneficially owned 63,649 shares of Company Stock or 0.66% of Class A shares.

38.    At all times relevant to the claims asserted in this action, Defendant **Darren P. McKewen** was Vice President and Group Publisher, Tax and Accounting Services of BNA and a Director of the Company. He began serving as a Director of the Company in 2007. He was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, he beneficially owned 27,179 shares of Company Stock or 0.28% of Class A shares.

8

39.     At all times relevant to the claims asserted in this action, Defendant **David M. Victor** was Director, Corporate and Tax Sales Division of the Company and a Director of the Company. He was actively involved in and exercised control over the day-to-day operations of the Company. As of August 24, 2011, he beneficially owned 107,200 shares of Company Stock or 1.12% of Class A shares.

40.     From March 10, 2011 until April 16, 2011, Defendant **Neil Froemming** was a Director of the Company. During that time, he was actively involved in and exercised control over the day-to-day operations of the Company. As of March 25, 2011, he beneficially owned 147,086 share of Company Stock or .96% of Class B shares.

41.     At all times relevant to the claims asserted in this action, Defendant **Robert Ambrosini** was the Chief Financial Officer ("CFO") of BNA. He was actively involved in and exercised control over the day-to-day operations of the Company. In his role as CFO, he was responsible for the financial management of BNA, including managing the Company's financial reporting systems, formulating financial plans, complying with financial reporting requirements of regulatory agencies, and consulting with Company units concerning the financial aspects of their activities. He also was responsible for reporting to the Board on the financial condition of the Company. As of August 24, 2011, he beneficially owned 13,541 shares of Company Stock or 0.14% of Class A shares.

42.     At all times relevant to the claims asserted in this action, Defendant **Jonathan Newcomb** was a Director of the Company. He was actively involved in and exercised control over the day-to-day operations of the Company.

43.   At all times relevant to the claims asserted in this action, Defendant **Ellen Taus** was a Director of the Company. She was actively involved in and exercised control over the day-to-day operations of the Company.

44.   At all times relevant to the claims asserted in this action, Defendant **Daniel Toohey** was a Director of the Company. He was actively involved in and exercised control over the day-to-day operations of the Company.

45.   At all times relevant to the claims asserted in this action, Defendant **Gerald Hobbs** was a Director of the Company.  He was actively involved in and exercised control over the day-to-day operations of the Company.

46.   All defendants named in this Complaint are collectively referred to as "Defendants."

47.   All defendants named in this Complaint other than BNA are collectively referred to as the "Individual Defendants."

48.   Defendants Paul N. Wojcik, Gregory C. McCaffery, Paul A Blakely, Cynthia J. Bolbach, George Korphage, Eunice F. Lin, Darren P. McEwen, Jonathan Newcomb, Gerald Hobbs, Ellen Taus, Daniel Toohey, David M. Victor, and Neil Froemming were members of BNA's Board of Directors at the time of the March 10, 2011 Board meeting and are hereinafter collectively referred to as the "March Board."

49.   Defendants Paul Wojcik, Gregory McCaffery, Paul Blakely, Darren McKewen, and David Victor are BNA Board members who purchased Stock under BNA Stock Purchase and Transfer Plan No. 123 during the Class Period and are hereinafter collectively referred to as the "SPTP 123 Defendants."

50.   At all times relevant to the claims asserted in this action, Defendants had access to confidential and proprietary information regarding the operations of BNA, including its

finances, its financial condition, its present and future business prospects, and matters affecting the fair value of the Stock.

51.   Defendants' access to this information came through internal corporate documents, conversations with other officers, managers and directors of the Company, and attendance at Company Board meetings and management meetings.  This information was otherwise unavailable to most of the Company's shareholders, including Plaintiffs and all Class members.

### IV.   SUBSTANTIVE ALLEGATIONS

### A.   Company Stock Ownership

52.   For roughly half a century before being acquired by Bloomberg, BNA allowed its employees to purchase Company Stock and BNA was an employee-owned company.

53.   At all times relevant to the claims asserted in this action, BNA was the oldest fully employee-owned company in the United States.

54.   Company Stock could be purchased through two employee benefit plans, the BNA 401(k) Plan and the BNA Stock Purchase and Transfer Plan (the "SPTP").

55.   The SPTP was first adopted by the Company in the late 1940's.  It was the original and principal vehicle available to employees to invest in or to sell Company Stock.

56.   Company Stock was not publicly traded on any stock exchange.

57.   The SPTP and the 401(k) Plan were the only market for Company Stock.

58.   There were three types of Company Stock, Class A, Class B, and Class C.

59.   Class A stock was issued to persons who were officers or employees of BNA at the time of issuance.  Employees and officers of BNA's subsidiary corporations were permitted to

11

purchase Class A stock as long as 80% or more of the subsidiary's stock was owned by BNA. Class A stock included voting rights.

60. Class B stock was issued in exchange for Class A stock to BNA officers or employees upon their retirement from BNA, or to the estates of deceased BNA officers or employees upon their death. Class B stock was non-voting stock and was exchanged for Class A stock on a share for share basis.

61. Class C stock was issued in exchange for Class A stock to officers and employees of a BNA subsidiary upon the disposition of the subsidiary, or when BNA's ownership of the subsidiary fell to less than 80%. Class C stock was non-voting stock and was exchanged for Class A stock on a share for share basis.

62. As of the close of business on August 24, 2011, there were 9,597,017 Class A shares, 15,513.363 Class B shares and 6,450 Class C shares issued and outstanding.

63. The provisions regarding the sale, ownership, and redemption of Company Stock as established by BNA's Board of Directors were contained in BNA's Articles of Incorporation and in The Bureau of National Affairs, Inc. Stock Ownership Provisions ("SOPs") adopted by the Board on September 6, 2001, as amended from time to time, and as last amended September 9, 2010.

64. The SOPs set forth provisions in addition to those contained in BNA's Articles of Incorporation, and the Board had the right at any Board meeting to supplement, alter, amend or repeal the SOPs.

65. Pursuant to BNA's Articles of Incorporation, the Board authorized itself to fix by resolution or resolutions the designations and powers, preferences and rights of the stock

of the Corporation, and the qualifications, limitations, or restrictions in respect thereof, to the extent such were not fixed in BNA's Certificate of Incorporation.

66.     Pursuant to BNA's Articles of Incorporation and SOPs, twice each year, generally in March and September, the Board determined the price at which Class A, B, and C shares of Stock would be redeemed, and the price at which Class A shares could be purchased by eligible employees.

### B.     The SPTP

67.     The SPTP consisted of a series successive six month stock programs.  Each six month program was referred to by a successive number.  The final six month program in effect just prior to the sale of BNA to Bloomberg was referred to as SPTP No. 124.

68.     The Board issued a prospectus for each SPTP program.  Stated in each prospectus was the price established by the Board at which Class A, B and C shares of Company Stock would be redeemed and at which Class A stock could be purchased by eligible employees.

69.     Neither the United States Securities and Exchange Commission, nor any state securities commission passed upon the accuracy of the information contained in the Board's SPTP prospectuses.

70.     At all times relevant to the claims asserted in this action, pursuant to the Board's SOPs, the SPTP operated through an SPTP Administrator designated by the Board and who served at the Board's pleasure.

71.     The SPTP Administrator carried out the ministerial duties required to give effect to the Board's decisions on the pricing, purchasing or selling of Company Stock.

72. Pursuant to the SOPs, the Board could designate one or more Assistant Administrators for the SPTP with powers to perform any of the SPTP Administrator's duties.

73. Pursuant to the SOPs, the SPTP Administrator accepted shares of Company Stock tendered by shareholders who wished to sell their shares back to BNA at the price established by the Board, and then the SPTP Administrator forwarded those shares to BNA for repurchase.

### C.    Purchasing BNA Stock under the SPTP

74. BNA employees could purchase Class A stock under the SPTP in multiple ways, including through payroll deductions and offers to buy ("OTBs").

75. An employee could authorize payroll deductions for the purchase of Company Stock and the authorized amount would be taken out of each paycheck and held in an account without interest until it was time to purchase Stock.  Funds from payroll deductions would then be used to purchase Stock at the close of the SPTP period at the per share price set by the Board.

76. BNA employees also could make OTBs.  OTBs had to be submitted to BNA approximately three weeks before the close of an SPTP six month period.

77. Pursuant to the SOPs, the SPTP Administrator maintained records of payroll deductions and OTBs from eligible employees under each SPTP and rendered an accounting of these matters to the Board.

### D.    Redemption of BNA Stock Under the SPTP

78. At the beginning of each SPTP six-month period, the Board set the price at which Company Stock shares would be repurchased by BNA.

79.   BNA shareholders who wished to sell their shares could submit them to the SPTP
      Administrator at any time during the SPTP six-month period, with the exception of the
      one-week period immediately preceding the close of the six-month period.

80.   Once BNA shareholders tendered their Stock to BNA for repurchase, the transactions
      generally were processed within five business days.

### E.   SPTP No. 123

81.   The prospectus for SPTP No. 123 ("123 Prospectus"), which was reviewed and
      authorized by BNA's Board and dated September 13, 2010, stated: "At its meeting
      scheduled for March 10, 2011, the BNA Board of Directors will fix the price at which
      Class A shares can be purchased by eligible employees during the period Sept. 20, 2010
      — March 19, 2011."

82.   The 123 Prospectus further stated: "At its meeting on Sept. 8, 2010, The Board fixed, at
      $16.50 per share, the price at which the Corporation may repurchase shares of BNA Class
      A, Class B, and Class C common stock during the period Sept. 20, 2010 — March 19,
      2011."

83.   At its March 10, 2011 meeting, the March Board set the price at which Class A shares
      could be purchased by eligible employees under SPTP No. 123 at $17.50 per share.
      Purchases of Class A shares by eligible employees pursuant to SPTP No. 123 were
      executed on March 19, 2011.

### F.   SPTP No. 124

84.   The prospectus for SPTP No. 124 ("124 Prospectus") which was reviewed and authorized
      by the March Board and dated March 14, 2011, stated: "At its meeting scheduled for
      September 8, 2011, the BNA Board of Directors will fix the price at which Class A

shares can be purchased by eligible employees during the period March 21, 2011 —
September 17, 2011."

85.    The 124 Prospectus further stated:  "At its meeting on March 10, 2011, The Board fixed,
       at $17.50 per share, the price at which the Corporation may repurchase shares of BNA
       Class A, Class B, and Class C common stock during the period March 21, 2011 —
       September 17, 2011."

86.    Under SPTP No. 124, and prior to the announcement of Bloomberg's acquisition of BNA
       on August 25, 2011, over 400,000 shares of Company Stock were repurchased by BNA
       from shareholders at a price of $17.50 per share. Upon information and belief,
       approximately half of these shares were repurchased from unwitting Class members.

### G.    BNA's Stock Price

87.    At all times relevant to the claims asserted in this action, BNA was the oldest fully
       employee-owned company in the United States.

88.    Over the years, BNA's management continually emphasized to employees the benefits of
       remaining an employee-owned enterprise.

89.    At all times relevant to the claims asserted in this action, BNA's Articles of Incorporation
       provided that the Board would establish both the price at which BNA would redeem
       Class A, Class B, and Class C shares, and the price at which Class A shares would be
       sold to eligible employees.

90.    The Board's setting of the Stock price was done internally and without the benefit of an
       independent third party valuation.

91.    The stated aim of BNA's Board when setting the price was to set an appropriate stock
       price that ensured a strong market for the stock, provided investors with a good and stable

return, and was fiscally supportable and consistent with the operation of BNA as an ongoing employee-owned business.

92. Because BNA valued employee ownership, the Board typically set the Stock price at a value lower than what could be obtained from an acquirer of the Company in a takeover transaction.

93. On March 10, 2011, at its regularly scheduled Board meeting, the March Board continued the Company's decades-long practice of setting the price of BNA stock as if it would continue as an employee-owned business.

94. At that meeting, the March Board set the repurchase price at $17.50 per share. This price represented just a $1.00 increase over the $16.50 repurchase price previously set by the Board at its September 8, 2010 Board meeting.

95. On March 10, 2011, by continuing its regular practice of setting the repurchase price as if BNA would continue as an employee-owned business, BNA and the March Board represented to shareholders that BNA was not for sale.

96. The $17.50 per share price was meant to leave the Plaintiffs and all Class members with the impression that BNA would remain as the longest fully employee-owned company in the United States, and that BNA was not interested in seeking purchasers for the Company.

97. At all times relevant to the claims asserted in this action, BNA Board members often received questions from shareholders about whether or not the Company was for sale because the common expectation among the shareholders was that if the Company ever was for sale, the value of the Stock would increase significantly.

98. Whether the Company was for sale was material information to all shareholders.

99.   The materiality of this information is evident from the fact that all Defendants who owned Company Stock during the Class Period chose not to sell their shares during the Class Period.

100.  Until the August 25, 2011 announcement of the sale of BNA to Bloomberg, BNA had never publicly stated to all shareholders that it had initiated steps to sell the Company.

101.  The fact that at the March 10, 2011 Board meeting, the March Board expressed its support for Defendant Paul Wojcik to consider the process further relating to a potential sale of the Company was a complete departure from BNA's decades-long strict adherence to a corporate structure of full employee ownership.  This departure constituted material information that should have been provided to shareholders.

102.  The information provided to Plaintiffs and all Class members by the Defendants during the Class Period never mentioned that the Board had given Defendant Paul Wojcik its support to consider the process further relating to a potential sale of the Company, or any of the efforts undertaken by management to sell the Company.

103.  This information was withheld from Plaintiffs and all Class members by Defendants during the Class Period even though such information affected the value of the Stock and should have resulted in the Board setting the Stock price much higher than $17.50 per share.

104.  This information was withheld from Plaintiffs and all Class members by Defendants during the Class Period even though Defendants chose to continue to operate the SPTP during the Class Period, knowing that some shareholders would redeem their shares of Company Stock at the artificially low price of $17.50 per share.

105.   Defendants, by their actions, caused Plaintiffs and all Class members to sell their Stock at the artificially low price of $17.50 per share, which they knew was less than fair value and less than adequate consideration for the Stock.

### H.   The March 10, 2011 Board Meeting

106.   Upon information and belief, BNA's management had been preparing for a sale of the Company months in advance of the March 10, 2011 Board meeting.

107.   At the March 10, 2011 Board meeting, Evercore made a presentation to the March Board about a possible sale of the Company.

108.   Upon information and belief, BNA and its management had been working with Evercore in advance of the March 10, 2011 Board meeting to assist Evercore in the preparation of the Board presentation.

109.   In its March 10, 2011 presentation, Evercore detailed for the March Board the steps already undertaken to ready the Company for sale. Evercore identified as in process, a draft offering memorandum and a data room largely cleansed of BNA's older files and being updated to contain BNA's key financial, business, and legal documents.

110.   Upon information and belief, by the date of the March 10, 2011 Board meeting Defendant Robert Ambrosini, as CFO and manager of the Company's financial data, knew of the data room being updated to contain BNA's key financial documents. Consequently, he knew that preparations were being made to ready the Company for sale.

111.   The existence of the data room and the draft offering memorandum evidenced the serious intentions of BNA and the March Board to sell the Company, and the substantial progress that had already been made in readying the Company for sale before the March 10, 2011 Board meeting.

19

112.   At the March 10, 2011 Board meeting, Evercore informed the Board that these extensive advance preparations would probably yield a definitive sale agreement within four months of initial calls being made to bidders, and that bidders for the Company would likely pay between $33 and $40 per share for the Company's stock.

113.   After hearing Evercore's presentation, the March Board gave its support for Defendant Paul Wojcik to consider the process further relating to a potential sale of the Company, and then proceeded to set the redemption price for Company Stock under SPTP No. 124 at $17.50 per share.

114.   By setting the price at $17.50 per share, the March Board continued the Company's decades-long practice of setting the price of BNA stock as if BNA would continue as an employee-owned business, even though the Board knew the Company was for sale.

115.   Defendant Robert Ambrosini, as CFO, knew that the $17.50 per share price was just a continuation of the Company's decades-long practice of setting the price of BNA stock as if BNA would continue as an employee-owned business.  As CFO, he also knew that because the Company was for sale the price of the Stock set by the March Board did not reflect the fair value of the Stock.

116.   The $17.50 per share price failed to take into consideration: the information Evercore had provided to the March Board regarding the Company's advance preparations for a sale; the likelihood of a sale within four months of the receipt of initial bids; and a likely purchase price between $33 and $40 per share.

117.   The $17.50 per share price also failed to take into consideration the March Board's expressed support for Defendant Paul Wojcik to consider the process further relating to a potential sale of the Company.

20

118.    The $17.50 per share price was communicated to shareholders in multiple ways.

119.    On March 10, 2011, BNA and the March Board announced the $17.50 per share price via
        e-mail to shareholders.  That same day, BNA and the March Board announced the $17.50
        per share price in a letter sent to shareholders.

120.    Four days later, on March 14, 2011, BNA and the March Board issued the prospectus for
        SPTP No. 124 which contained the $17.50 per share price set by the Board at the March
        10, 2011 Board meeting.

121.    The March Board's modest increase in the per share price of $1.00 from the previous
        $16.50 per share price set at the September 8, 2010 Board meeting communicated to
        BNA shareholders that it was business as usual, and that the Board intended for the
        Company to remain the oldest fully employee-owned company in the United States.

122.    At no time after the March 10, 2011 Board meeting, or during the Class Period, did any
        Board member take any action to suspend the day-to-day operation of the SPTP, despite
        directing the SPTP Administrator to accept Stock for redemption at a grossly undervalued
        price.

                        I.      **Progression of the Sale of BNA**

123.    On April 16, 2011, Defendant Marcia Kaplan became a Director of the Company and
        participated in the April 16, 2011 Board meeting, and the Board meetings thereafter, and
        thus knew that the Company was for sale.

124.    On April 16, 2011, the same day as the BNA annual shareholders meeting, the Board met
        to discuss both the specific terms of Evercore's engagement, and the details relating to
        the process for soliciting bidders for the purchase of BNA.

21

125. During the last two weeks of April of 2011, BNA worked with, Skadden, Aarps, Slate, Meagher & Flom LLP ("Skadden"), special counsel to the Company, and Evercore to prepare the materials for the auction of the Company.

126. During the first week of May of 2011, Evercore contacted seventeen potential strategic purchasers or financial sponsor purchasers, including Bloomberg.

127. In May of 2011, Skadden assisted the Company in negotiating the terms of confidentiality agreements with seven bidders for BNA.

128. By May 17, 2011, Evercore requested that all participants in the auction submit written proposals to acquire the Company to Evercore by June of 2011.

129. Thereafter, from approximately May 26, 2011 until June 15, 2011, BNA's management, including Defendant Paul Wojcik, the Company's Chairman and CEO, participated in discussions with potential purchasers of the Company, including Bloomberg.

130. On June 3, 2011, Bloomberg had an informational telephone call with BNA's management and on June 7, 2011, Bloomberg submitted a preliminary proposal to acquire the Company at an aggregate price of $750 million to $850 million, or $30 to $33 per share of Company stock based on 25.4 million shares outstanding as of April 24, 2011.

131. Four other bidders also submitted bids to acquire the Company in the range of $23.78 to $35.00 per share

132. On June 9, 2011, during the Company's regularly scheduled Board meeting, Defendant Paul Wojcik updated the other members of the Board regarding the proposals that had been received from potential purchasers of the Company.  These proposals were evaluated by the Board and next steps were discussed, including the potential for final

bids to show improved valuation following a more detailed due diligence review of the Company.

133. During the June 9, 2011 Board meeting, the Board authorized BNA management to proceed with next steps in the sale process with Bloomberg, as well as three other bidders.

134. On June 16, 2011, Bloomberg was granted access to information in order to conduct a more detailed due diligence investigation of the Company.

135. On June 30, 2011, Bloomberg's management met with the BNA's management, including Defendant Paul Wojcik, to conduct additional due diligence investigation.

136. On July 13, 2011, Evercore requested final bids from the potential purchasers of the Company by August 12, 2011. BNA received final bids ranging from $38.50 to $40.00 per share.

137. On August 23, 2011, at a special meeting of the Board, the Board unanimously approved entering into an exclusivity agreement with Bloomberg Inc. The Board directed the Company's management to continue negotiations on the merger agreement with Bloomberg.

138. On August 24, 2011, the Board finalized the details of the merger agreement with Bloomberg. At that meeting, the Board received an opinion from Evercore that the consideration of $39.50 per share for the Company common stock was fair from a financial point of view to the holders of the Company common stock. At the conclusion of the meeting, the Board approved the terms of the merger agreement and authorized the Company's management to execute the merger agreement.

139. Bloomberg's $39.50 per share price was more than twice the price set by the March Board at the March 10, 2011 Board meeting, and was at the highest end of the range of purchase prices presented by Evercore to the Board at that March 10, 2011 meeting.

140. On August 25, 2011 a joint press release was issued by the Company and Bloomberg announcing the merger.

**J.   Acquisition of Additional Stock by
Certain Defendants During the Class Period**

141. At all times relevant to the claims alleged in this action, the SPTP 123 Defendants were current employees of BNA and were eligible to purchase Stock under the SPTP.

142. At all times relevant to the claims alleged in this action, Defendant Robert Ambrosini was a current employee of BNA and was eligible to purchase Stock under the SPTP.

143. The period for purchases of Class A Stock under SPTP No. 123 ran from September 20, 2010 through March 19, 2011.

144. At the March 10, 2011 Board meeting, the SPTP 123 Defendants voted to set the price at which eligible employees could purchase Class A Stock under SPTP No. 123 at $17.50 per share.

145. The SPTP 123 Defendants set the $17.50 per share purchase price with full knowledge that the likely purchase price of the Stock in a Company sale transaction would be between $33 and $40 per share.

146. Upon information and belief, Defendant Robert Ambrosini, as CFO, knew that the $17.50 per share set by the Board at the March 10, 2011 meeting did not take into account the sale of the Company and, therefore, did not reflect the fair value of the Stock.

147.    Pursuant to SPTP No. 123, the SPTP 123 Defendants and Robert Ambrosini proceeded to acquire additional Stock during the Class Period at the $17.50 per share price either through payroll deductions and/or OTB's.

148.    By the date their purchases were consummated on March 19, 2011, the SPTP 123 Defendants and Defendant Robert Ambrosini knew that the Company was for sale; knew of the extensive advance preparations already undertaken by the Company regarding the sale; knew that a sale of the Company was likely within four months of initial calls being made to bidders; knew that the likely purchase price would be between $33 and $40 per share; and/or knew of the Board's support for Defendant Paul Wojcik to consider the process further relating to a potential sale of the Company.

149.    Consequently, these purchases of Stock made by the SPTP 123 Defendants and Defendant Robert Ambrosini during the Class Period were made based upon material non-public information relating to the potential sale of the Company and the anticipated increased price of the Stock upon such sale.

150.    The acquisition of additional Stock by SPTP 123 Defendants and Defendant Robert Ambrosini at the artificially low price of $17.50 per share during the Class Period through purchases under SPTP No. 123 was based on material non-public information relating to the potential sale of the Company in violation of federal securities laws.

### K. Attempted Acquisition of Additional Stock By Certain Defendants During the Class Period

151.    On April 16, 2011, following her election to the Board, Defendant Marcia Kaplan learned that the Company was for sale and that the likely purchase price of the Stock in a Company sale transaction would be between $33 and $40 per share.

152. The period for purchases of Class A stock by eligible employees under SPTP No. 124 ran from March 21, 2011 through September 17, 2011.

153. Upon information and belief, the SPTP 123 Defendants and Defendants Robert Ambrosini and Marcia Kaplan attempted to acquire additional Stock during the Class Period pursuant to payroll deductions and/or OTB's made under SPTP No. 124.

154. Upon information and belief, these attempts to acquire additional Stock under SPTP No. 124 during the Class Period were made based upon material non-public information relating to the potential sale of the Company and the anticipated increased price of the Stock upon such sale.

155. While no purchases of Stock under SPTP No. 124 were consummated due to the announcement of the sale of BNA to Bloomberg prior to the close SPTP No. 124, attempts by the SPTP 123 Defendants and Defendants Robert Ambrosini and Marcia Kaplan to acquire additional shares under SPTP No. 124 are further evidence of the intentions of these particular Defendants to trade in the Stock based on knowledge of material non-public information in violation of federal securities laws.

### L.   Lack of Knowledge by the Plaintiffs and the Class of Material Non-Public Information

156. Plaintiffs and all Class members who redeemed their shares at $17.50 per share during the Class Period were unaware of the material non-public information known to the Defendants relating to the potential sale of the Company and the anticipated increased price of the Stock upon such sale.

157. During the Class Period, Defendants who owned Company Stock had knowledge of material non-public information relating to the potential sale of the Company and the

26

anticipated increase in the price of the Stock upon such sale, and they chose not to sell any of their Stock during the Class Period.

158.   Of the over 400,000 shares of Stock repurchased by BNA at $17.50 per share during the Class Period, not one of those shares was repurchased from a Defendant who owned Company Stock.

### M.   Defendants' Material Misrepresentations and Omissions

159.   In the March 10, 2011 email and letter to shareholders, and the March 14, 2011 SPTP Prospectus to shareholders, the March Board stated that the Company Stock was worth $17.50 per share.

160.   The March Board conveyed the $17.50 price per share to Plaintiffs and other Class members when they knew that the price did not reflect the fair value of the Stock.

161.   Defendant Robert Ambrosini, as CFO, also knew that the $17.50 per share price did not reflect the fair value of the Stock.

162.   BNA, the March Board, and Defendant Robert Ambrosini knew that the $17.50 per share price did not represent the fair value of the Stock because it did not take into consideration:

- the Board's intention to pursue a sale of the Company;
- the extensive advance preparations already undertaken to ready the Company for sale which included a draft offering memorandum and a data room largely cleansed of BNA's older files and being updated to contain BNA's key financial, business, and legal documents;
- that these extensive advance preparations would probably yield a definitive sale agreement within four months of initial calls being made to bidders;

27

- that bidders for the Company would likely pay between $33 and $40 per share for the Company's Stock; or

- that the Board had given its support to Defendant Paul Wojcik at the meeting to consider the process further relating to a potential sale of the Company;

163. Representations to shareholders that the Stock was worth $17.50 per share were misleading because BNA, the March Board, and Defendant Robert Ambrosini knew the Company was for sale and that the $17.50 per share price:

- was not a fair value of the Stock;

- substantially understated the fair value of the Stock;

- concealed the fair value of the Stock;

- represented to shareholders that BNA was not for sale; and

- represented to shareholders that BNA intended to remain the oldest fully employee-owned company in the United States.

164. Representations to shareholders that the Stock was worth $17.50 per share also were misleading because BNA, the March Board, and Robert Ambrosini knew the Company was for sale and no longer should be valued on internal operating metrics, but rather should be valued at a price that a willing buyer would pay for the Company.

165. The March 14, 2011 SPTP Prospectus to shareholders was misleading because it omitted the following material information:

- that BNA was for sale;

- that extensive advance preparations had already been undertaken to ready the Company for sale, including a draft offering memorandum and a data room

largely cleansed of BNA's older files and being updated to contain BNA's key financial, business, and legal documents;

- that these extensive advance preparations would probably yield a definitive sale agreement within four months of initial calls being made to bidders;

- that bidders would likely pay between $33 and $40 per share for the Company's Stock; and

- that the Board had given its support to Defendant Paul Wojcik at the meeting to consider the process further relating to a potential sale of the Company.

166. The misrepresentations of BNA, the March Board, and Robert Ambrosini regarding the value of Company Stock, their omissions relating to the potential sale of the Company, and their adherence to historic Company Stock valuation practices despite the potential sale of the Company, were part of a common scheme to mislead BNA's shareholders regarding the fair value of their Stock and to induce shareholders to redeem their Stock at less than fair value.

167. Defendant Marcia Kaplan, upon learning that the Company was for sale on April 16, 2011, took no action to correct these false and misleading statements and omissions. By her inaction, she became part of the other Defendants' common scheme to mislead BNA's shareholders regarding the fair value of their Stock and to induce shareholders to redeem their Stock at less than fair value.

168. At no time during the Class Period did any Defendant disclose to Plaintiffs and all Class members that the Company was for sale.

169. At no time during the Class Period, did any Defendant take any action to:

- correct these false and misleading statements and omissions;.

29

- revalue the Stock to reflect its fair value;

- suspend the operation of the SPTP, despite knowing that unwitting shareholders were redeeming their Stock under the SPTP at less than fair value without knowledge of the potential sale of the Company;

- prohibit the acquisition of additional Stock by the SPTP 123 Defendants and Robert Ambrosini, all of whom were eligible to acquire more Stock and who possessed material non-public information regarding the potential sale of the Company; or

- prohibit the attempted acquisition of additional Stock by the SPTP 123 Defendants, Robert Ambrosini or Marcia Kaplan, all of whom were eligible to acquire more Stock under SPTP No. 124 and who possessed material non-public information regarding the potential sale of the Company.

170. At no time during the Class Period did the SPTP 123 Defendants or Defendant Robert Ambrosini voluntarily cease acquiring more Stock, even though they possessed material non-public information regarding the potential sale of the Company.

171. Upon information and belief, at no time during the Class Period did the SPTP 123 Defendants or Defendants Robert Ambrosini and Marcia Kaplan refrain from attempting to acquire more Stock under SPTP No. 124, even though they possessed material non-public information regarding the potential sale of the Company.

172. Based upon Defendants' material misrepresentations and omissions, Plaintiffs and all Class members elected to sell their shares to BNA at a price substantially below the fair value of the Stock.

173. Defendants, by their actions:

30

- in undervaluing the Stock;

- in making material misrepresentations and omissions in communications with shareholders;

- in directing and allowing the continued operation of the SPTP; and/or

- by failing to take any corrective action during the Class Period,

caused Plaintiffs and all Class members to sell their shares of Company Stock back to BNA for less than adequate consideration.

174. But for Defendants' actions, Plaintiffs and all Class members would not have sold their shares back to BNA during the Class Period for less than adequate consideration.

175. Defendants' material misrepresentations and omissions were designed to obtain Stock from Plaintiffs and all Class members at less than fair value.

176. Any Defendant who owned Stock during the Class Period directly benefited from these actions because the divestiture of shares by Plaintiffs and all Class members at an artificially low price prior to the sale of BNA to Bloomberg resulted in a corresponding increase in the value of the remaining shares, many of which were held by these same Defendants.

## N.    Defendants' profits

177. Defendants who owned Stock during the Class Period stood to make, and eventually did make, a tremendous profit upon the consummation of the sale of BNA to Bloomberg. Collectively, Bloomberg paid these Defendants over $51 million for their shares — which was $28 million more than the price these Defendants would have received had their shares been redeemed by BNA at the $17.50 per share price set by the Board on March 10, 2011.

178.   Defendant CEO, Paul Wojcik, received $7,939,342.00 for his shares of Stock and President and COO, Gregory McCaffery, received $5,451,632.00 for his shares of Stock.

179.   The SPTP 123 Defendants and Defendant Robert Ambrosini acquired additional Stock during the Class Period at the artificially low price of $17.50 per share following the March 10, 2011 meeting.

180.   These acquisitions were made by these particular Defendants, with knowledge that the likely price of the Stock in a sale transaction would be double that price.

181.   These particular Defendants tendered their additional shares acquired during the Class Period to Bloomberg at a profit of $22.00 per share.

182.   By misleading shareholders about the value of the Stock, and keeping the plan to sell the Company a secret, these Defendants were able to purchase additional shares during the Class Period at a severely discounted price, thereby increasing their personal wealth.

183.   On April 16, 2011, upon learning of the plan to sell the Company, Defendant Marcia Kaplan took no steps to correct the false and misleading representations and omissions made by the other Defendants after the March 10, 2011 Board meeting. Defendant Marcia Kaplan, by her inaction, became part of the Defendants' common scheme to mislead BNA's shareholders regarding the fair value of their Stock and to induce shareholders to redeem their Stock at less than the fair value.

184.   By misleading shareholders about the value of the Stock, and keeping the plan to sell the Company a secret, the Defendants who owned shares of Stock during the Class Period increased the value of their shares because the redemption of Stock from Plaintiffs and all Class members prior to the sale of BNA to Bloomberg resulted in a corresponding increase in the value of the remaining shares held by these particular Defendants.

### O.   Sale of Stock by Plaintiffs during the Class Period

185.   During the Class Period, Plaintiff Eileen Joseph sold 2500 shares of Company Stock to BNA for $17.50 per share. She sold her shares for $22.00 less per share than what she

would have received if she had tendered her shares to Bloomberg at $39.50 per share pursuant to Bloomberg's Tender Offer. Due to Defendants' material misrepresentations and omissions, Plaintiff Eileen Joseph sold her Stock and lost $55,000 when she sold her Stock back to BNA at the artificially low price of $17.50 set by the Board on March 10, 2011.

186.   During the Class Period, Plaintiff Daniel Wishnatsky sold 1500 shares of Company Stock to BNA for $17.50 per share. He sold his shares for $22.00 less per share than what he would have received if he had tendered his shares to Bloomberg at $39.50 per share pursuant to Bloomberg's Tender Offer. Due to Defendants' material misrepresentations and omissions Daniel Wishnatsky sold his Stock and lost $33,000 when he sold his Stock back to BNA at the artificially low price of $17.50 set by the Board on March 10, 2011.

187.   During the Class Period, Plaintiff Randall Brooks sold 66,580 shares of Company Stock to BNA on August 11, 2011 for $17.50 per share. He sold his shares for $22.00 less per share than what he would have received if he had tendered his shares to Bloomberg at $39.50 per share pursuant to Bloomberg's Tender Offer. Due to Defendants' material misrepresentations and omissions Randall Brooks sold his Stock and lost $1,464,760.00 when he sold his Stock back to BNA at the artificially low price of $17.50 set by the Board on March 10, 2011.

188.   Upon information and belief, there are approximately 100 additional Class members who sustained similar losses by selling their shares of Company Stock back to BNA during the Class Period at the artificially low price of $17.50 per share set by the Board on March 10, 2011.

## V.   CLASS ACTION ALLEGATIONS

## A.      Class certification under Rule 23(a) and 23(b)(3)

189.   Plaintiffs Eileen Joseph and Daniel Wishnatsky bring this action as a class action

pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

190.   Plaintiffs Eileen Joseph and Daniel Wishnatsky seek appointment as co-lead Plaintiffs

representing the following Class ("Class"):

> All persons who sold BNA stock ("Company Stock" or "Stock") through The
> BNA Stock Purchase and Transfer Plan ("SPTP") from March 21, 2011
> through August 25, 2011 ("Class Period") and received $17.50 per share for
> the Stock.
>
> The Class excludes: (i) any Defendants named in the Complaint; (ii) any
> officers and directors of the Company during the Class Period; (iii) any
> individuals who may be liable for the claims asserted in the Complaint; and
> (iv) any members of the immediate families of any person described in (i)
> through (iii).

191.   Certification of the Class is appropriate because all of the prerequisites of Fed. Civ. Rule

23(a) are satisfied.

192.   Pursuant to Fed. Civ. Rule Rule 23(a)(1), the members of the Class, which are estimated

to number approximately 100, are so numerous that joinder of all members is

impracticable.

193.   Although the exact number of Class members is unknown to Plaintiffs at this time, and

can only be determined through discovery, based upon filings with the United States

Securities and Exchange Commission, by the end of 2010, BNA, employed roughly

1,506 full-time and part-time employees. For 50 years BNA had allowed employees to

purchase Stock.  Consequently, by the date of the actions asserted in this Complaint the

number of current and former BNA employees who owned Stock was substantial.

BNA's SEC filings also state that over 400,000 shares of Stock were redeemed at the

$17.50 per share price during the Class Period.

194.   Pursuant to Fed. Civ. Rule 23(a)(2), there are questions of law or fact common to the

Class as enumerated below, in Section V. B of the Complaint.

195. Pursuant to Fed. Civ. Rule 23(a)(3), the claims brought by Plaintiffs are typical of those of the Class because the Plaintiffs and the Class members suffered damages as a result of Defendants' violation of federal law as alleged in the Complaint.

196. To the extent there are any differences among the Class members damages, such differences would be a product of simple mathematics based upon the individual number of shares sold and the value of Company Stock.

197. Pursuant to Fed. Civ. Rule 23(a)(4), Plaintiffs Eileen Joseph and Daniel Wishnatsky seek to be co-lead Plaintiffs for the Class in this action. They will adequately protect the interests of the Class because they do not appear to have any interests antagonistic to the other Class members, nor do they appear to have any unique claims or defenses that might undermine the efficient resolution of the Class claims. They have retained competent counsel from a law firm well versed in class actions, complex litigation, and securities law with the resources to pursue this action.

### B.    Class certification under Rule 23(b)(3)

198. Class certification is appropriate under Fed. Civ. Proc. Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

199. All Class members allege that Defendants engaged in wrongful conduct in violation of federal securities laws. The questions of law or fact common to all Class members that predominate over any questions affecting only individual members include:

    a.    Whether Defendants actions as alleged in the Complaint violated federal securities laws;

    b.    Whether Defendants made material misrepresentations and/or omissions as alleged in the Complaint;

c.      Whether Defendants' material misrepresentations and/or omissions as alleged in the Complaint were made connection with the purchase or sale of a security;

d.      Whether Defendants acted with scienter;

e.      Whether Defendants' false or misleading statements and/or omissions were part of a common scheme to defraud the Class members;

f.      Whether Class members sustained economic losses;

g.      Whether Defendants material misrepresentations and/or omissions as alleged in the Complaint were the cause of the Class members' economic losses;

h.      The proper measure of damages for the Class members;

i.      Whether certain Defendants traded in securities during the Class Period based on material non-public information in violation of federal securities laws;

j.      Whether Defendants misrepresented the fair value of Company Stock;

k.      Whether Defendants were aware of the potential sale of BNA;

l.      Whether Defendants failed to disclose to the Class the potential sale of BNA and other related facts as alleged in the Complaint;

m.      Whether Defendants knew or should have known that the false or misleading statements and/or omissions alleged in the Complaint constituted material information to Class members.

200.    A class action is superior to all other methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable, and because the damages of some Class members may be relatively small thereby making individual lawsuits impossible or impracticable as a way of redressing the wrongs suffered by them.

201.    There will be no difficulty in the management of this action as a class action.

### C.    Class certification under Rule 23(c)(4)

202.    Alternatively, if the Court declines to certify a class under Fed. R. Civ. Proc. 23(b)(3), Plaintiffs Eileen Joseph and Daniel Wishnatsky seek to represent a class pursuant to Rule

23(c)(4) with respect to the common issues raised in this litigation as enumerated in Section V. B of the Complaint.

### COUNT I
### VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT, 15 U.S.C. § 78j, AND RULE 10b-5, 17 C.F.R. 240.10b-5
### AGAINST ALL DEFENDANTS

203.  Plaintiffs hereby incorporate by reference the allegations in the previous paragraphs of the Complaint as if fully set forth herein.

204.  At all times relevant to the claims asserted in this action, Defendants, in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. S 78j, and Rule 10b-5, 17 C.F.R. 240.10b-5, and in connection with the sale of Company Stock, used an instrumentality of interstate commerce, or the mails:

      (i)     to engage in a scheme to defraud Plaintiffs and other Class members;

      (ii)    to make untrue statements of material fact;

      (iii)   to omit material facts that were necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and/or

      (iv)   otherwise engaged in acts, practices, or a course of business which operated as a fraud upon Plaintiffs and all Class members.

205.  Defendants' liability arises from the conduct set forth below.

206.  BNA, the March Board, and Robert Ambrosini knew the Company was for sale. Consequently, their representations to shareholders following the March 10, 2011 Board meeting that the Stock was worth $17.50 per share were misleading because the Company was for sale and the $17.50 per share price:

- was not a fair value of the Stock;

- substantially understated the fair value of the Stock;

- concealed the fair value of the Stock;

- represented to shareholders that BNA was not for sale; and

- represented to shareholders that BNA intended to remain the oldest fully
  employee-owned company in the United States.

207. Defendant Robert Ambrosini, as CFO, knew that the Company was for sale on March 10,
2011, yet took no action to correct the false and misleading statements made to
shareholders about the value of Company Stock.

208. Representations to shareholders that the Stock was worth $17.50 per share were
misleading because BNA, the March Board, and Robert Ambrosini knew the Company
was for sale and no longer should be valued on internal operating metrics, but rather
should have be valued at a price that a willing buyer would pay for the Company.

209. The March 14, 2011 SPTP Prospectus to shareholders was misleading because it omitted
the following material information:

- that BNA was for sale;

- that extensive advance preparations had already been undertaken to ready the
  Company for sale, including a draft offering memorandum and a data room
  largely cleansed of BNA's older files and being updated to contain BNA's key
  financial, business, and legal documents;

- that these extensive advance preparations would probably yield a definitive sale
  agreement within four months of initial calls being made to bidders;

- that bidders would likely pay between $33 and $40 per share for the Company's
  Stock; and

38

- that the Board had given its support to Defendant Paul Wojcik at the meeting to consider the process further relating to a potential sale of the Company.

210. Defendant Robert Ambrosini, as CFO, knew that the Company was for sale on March 10, 2011, yet took no action to correct these material omissions.

211. The misrepresentations of BNA, the March Board, and Robert Ambrosini regarding the value of Company Stock, their omissions relating to the potential sale of the Company, and their adherence to historic Company Stock valuation practices despite the potential sale of the Company, were part of a common scheme to mislead BNA's shareholders regarding the fair value of their Stock and to induce shareholders to redeem their Stock at less than fair value.

212. Defendant Marcia Kaplan, upon learning that the Company was for sale on April 16, 2011, took no action to correct these false and misleading statements and omissions. By her inaction, she became part of the other Defendants' common scheme to mislead BNA's shareholders regarding the fair value of their Stock and to induce shareholders to redeem their Stock at less than fair value.

213. Based upon Defendants' material misrepresentations and omissions, Plaintiffs and all Class members elected to sell their shares to BNA at a price substantially below the fair value of the Stock.

214. Defendants, by their actions:

    (i)    in undervaluing the Stock,

    (ii)    in making material misrepresentations and omissions in communications with shareholders,

    (iii)    in directing and allowing the continued operation of the SPTP; and/or

(iv)     by failing to take any corrective action during the Class Period,

caused Plaintiffs and all Class members to sell their shares of Company Stock back to

BNA for less than adequate consideration.

215.   Defendants' material misrepresentations and omissions were designed to obtain Stock

from Plaintiffs and all Class members at less than fair value.

216.   Based upon the Defendants' material misrepresentations and omissions, Plaintiffs and all

Class members elected to sell their shares to BNA at a price substantially below the fair

value of the Stock.

217.   Defendants intentionally or recklessly withheld the information about the plan to sell the

Company.  In fact, they took affirmative steps to ensure that the information remained

secret.

218.   During the Class Period, BNA, aided by the conduct of the Defendants, repurchased

shares of Stock from Plaintiffs and all Class members for $17.50 per share.

219.   Plaintiffs and all Class members were unaware of the Defendants' plan to sell the

Company.  If Plaintiffs and all Class members had been aware of this plan they would not

have sold their shares to BNA for $17.50 per share.

220.   But for Defendants' actions, Plaintiffs and all Class members would not have sold their

Stock back to BNA during the Class Period for less than adequate consideration.

221.   These false and misleading statements and omissions were connected to the purchase or

sale a security within the meaning of Section 10(b) and Rule 10(b)-5.

222.   Plaintiffs' reliance on Defendants' misrepresentations about the value of the Stock may

be presumed because the price of the Stock is a material term in each Class member's

redemption transaction during the Class Period, and because the $17.50 price was the same for each transaction.

223. On August 25, 2011, BNA announced that Bloomberg had agreed to purchase all shares of Company Stock for $39.50 per share, $22.00 per share more than BNA paid to Plaintiffs and all Class members.  Consequently, Plaintiffs and all Class members have suffered economic losses as a direct result of Defendants' intentional or reckless false and misleading statements and omissions of material, nonpublic information.

224. As a direct and proximate result of the Defendants' wrongful conduct as alleged in the Complaint, Plaintiffs and all Class members have suffered damages in connection with their sale of Stock at less than fair value during the Class Period.

225. Therefore, Defendants are liable under § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and under Rule 10b-5, 17 C.F.R. 240.10b-5, for losses sustained by Plaintiffs and all Class members.

## COUNT II
### VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT, 15 U.S.C. § 78t
### AGAINST THE INDIVIDUAL DEFENDANTS

226. Plaintiffs hereby incorporate by reference the allegations in the previous paragraphs of the Complaint as if fully set forth herein.

227. The Individual Defendants, by virtue of their positions as controlling persons, are liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t for BNA's violation of §10(b) and Rule 10b-5.

228. Each Individual Defendant, by virtue of his or her position with BNA either as an officer, as a director, or as both, acted as a controlling person of the Company within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t.

229.   Each Individual Defendant as a controlling person had involvement in and/or awareness of the Company's operations including the plan to sell the Company.

230.   Each Individual Defendant as a controlling person, had the power and authority to influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of information to Company shareholders regarding the value of Company Stock, and the withholding of information from Company shareholders regarding the sale of the Company.

231.   Each Individual Defendant had access to information relating to the sale of the Company and the value of Company Stock.

232.   Each Individual Defendant also had access to the March 10, 2011 email, the March 10 2011 letter, and the March 14, 2011 SPTP prospectus sent to shareholders that Plaintiffs allege are false and misleading.

233.   Each Individual Defendant had the ability to prevent and/or correct these false and misleading communications with shareholders.

234.   Each Individual Defendant also had the ability to prevent and/or correct the omission of material information regarding the sale of the Company.

235.   Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and is presumed to have had the power to control or influence the making of the false and misleading representations and omissions alleged in the Complaint, and to have exercised that power.

236.   Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and is presumed to have had the power to control or influence the SPTP transactions giving rise to the securities violations alleged in the Complaint, and to have exercised that power.

237.   BNA and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in the Complaint.

238. Each Individual Defendant, by virtue of his or her position as controlling person, is liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t for BNA's violation of §10(b) and Rule 10b-5.

239. As a direct and proximate result of each Individual Defendant's wrongful conduct as alleged in the Complaint, Plaintiffs and all Class members have suffered damages in connection with their sale of Stock at less than fair value during the Class Period.

240. Therefore, Defendants are liable are liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t for the losses sustained by Plaintiffs and all Class members.

### COUNT III
### VIOLATION OF SECTIONS 10(b) AND 14 OF THE EXCHANGE ACT, 15 U.S.C. §§ 78j AND 78n AND RULES 10b-5 AND 14e-3, 17 C.F. R. 240.10b-5 AND 17 C.F. R. 240.14e-3 AGAINST BNA, SPTP 123 DEFENDANTS, AND ROBERT AMBROSINI

241. Plaintiffs hereby incorporate by reference the allegations in the previous paragraphs of the Complaint as if fully set forth herein.

242. After the March 10, 2011 Board meeting, the SPTP 123 Defendants and Defendant Robert Ambrosini purchased additional shares of BNA stock under SPTP No. 123.

243. The SPTP 123 Defendants and Defendant Robert Ambrosini were aware of the potential sale of the Company and the extensive advance preparations already undertaken by the Company in preparation for the sale.   This information was material nonpublic information.

244. The SPTP 123 Defendants and Defendant Robert Ambrosini acquired this information from BNA, the issuer of the stock, or from an officer, director, partner or employee or any other person acting on behalf of BNA.

245. By virtue of their positions within the Company, each of the SPTP 123 Defendants and Defendant Robert Ambrosini owed a duty to BNA's shareholders to either disclose or abstain from trading on material, nonpublic information.

246.   BNA, also owed a duty to its shareholders to either disclose or abstain from trading on material, nonpublic information.

247.   The SPTP 123 Defendants and Defendant Robert Ambrosini purchased additional shares of Stock on or about March 19, 2011. As of that date, the SPTP 123 Defendant and Defendant Robert Ambrosini were aware of the substantial steps taken to commence a tender offer and that the information about these substantial steps was nonpublic. Purchases by the SPTP 123 Defendants and Defendant Robert Ambrosini thus were consummated after substantial steps had been taken to commence a tender offer for BNA.

248.   The SPTP 123 Defendants and Defendant Robert Ambrosini made a profit of $22.00 per share on the additional shares acquired on or about March 19, 2011, which shares were purchased based on material non-public information.

249.   Defendant BNA repurchased over 400,000 shares of Stock during the Class Period. Upon information and belief, approximately half of those shares were repurchased from unwitting Class members.

250.   BNA, through its officers and directors, was aware of the substantial steps taken to commence a tender offer and was aware that information about these substantial steps was nonpublic.

251.   Under Rule 14e-3 purchases by these Defendants during the Class Period constitute fraudulent, deceptive or manipulative acts or practices within the meaning of section 14(e).

252.   As a direct result of the intentional fraudulent, deceptive and/or manipulative acts of BNA, the SPTP 123 Defendants, and Defendant Robert Ambrosini, the Plaintiffs and all Class members sold their Stock at less than fair value during the Class Period and suffered economic losses.

253.   Therefore, Defendants are liable under §14(e) of the Securities Exchange Act and Rule 14e-3 for the losses sustained by Plaintiffs and all Class members.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a.       a determination that this case may be maintained as a class action under Fed. R. Civ. Proc. 23;

b.       that Plaintiffs Eileen Joseph and Daniel Wishnatsky be appointed as Co-Lead Plaintiffs for the Class;

c.       that undersigned counsel be appointed Class Counsel;

d.       recovery of all damages sustained by Plaintiffs and the Class as a result of the Defendants' wrongdoing in an amount to be proven at trial;

e.       recovery of actual damages in the amount of any losses suffered by Plaintiffs and the Class;

f.       the difference between the value the Class members received for their Stock sold during the Class Period and the fair value of what they would have received for their Stock had there been no fraudulent conduct by Defendants;

g.       prejudgment interest;

h.       an order awarding attorneys' fees and reasonable costs; and

i.       pursuant to Fed. R. Civ. Proc. 54(c), an order for such further relief to which the Plaintiffs and all Class members may be entitled, whether or not specifically demanded herein.

Respectfully submitted,

DINSMORE & SHOHL LLP

*Marshall B. Berman*

Marshall F. Berman (06984)
William A. Sherman (pro hac vice to be filed)
David J. Lavan (pro hac vice to be filed)
801 Pennsylvania Ave., N.W., Suite 610
Washington, D.C. 20004
Phone: (202) 372-9100
Fax: (202) 372-9141
Email:  marshall.berman@dinsmore.com
        william.sherman@dinsmore.com
        david.lavan@dinsmore.com

and

M. Gabrielle Hils (pro hac vice to be filed)
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202
Phone:  (513) 977-8200
Fax:  (513) 977-8141
Email:  gabrielle.hils@dinsmore.com

**Attorneys for Plaintiff**

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

DINSMORE & SHOHL LLP

*Marshall F. Berman*

Marshall F. Berman (06984)
William A. Sherman (pro hac vice to be filed)
David J. Lavan (pro hac vice to be filed)
801 Pennsylvania Ave., N.W., Suite 610
Washington, D.C. 20004
Phone: (202) 372-9100
Fax: (202) 372-9141
Email:  marshall.berman@dinsmore.com
        william.sherman@dinsmore.com
        david.lavan@dinsmore.com

and

M. Gabrielle Hils (pro hac vice to be filed)
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202
Phone:  (513) 977-8200
Fax:  (513) 977-8141
Email:  gabrielle.hils@dinsmore.com

**Attorneys for Plaintiff**

## CERTIFICATION OF EILEEN JOSEPH

Plaintiff, Eileen Joseph hereby certifies as follows pursuant to the Private Securities Litigation Reform Act of 1995:

1.      I have reviewed the Complaint in Joseph, et al. v. Bureau of National Affairs, Inc. et al. and authorized its filing.

2.      I did not purchase the security that is the subject of the Complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934, 15 U.S.C. 78a et seq.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      My transactions concerning the security that is the subject of the Complaint during the Class Period specified in the Complaint is as follows: I sold 1,500 shares of BNA Company Stock through the SPTP on or about April 15, 2011, 2011 and 1,000 shares of BNA Company Stock through the SPTP on or about June 10, 2011.

5.      I have not sought to serve, or served, as a representative party on behalf of a class during the 3-year period preceeding the date on which this certification is filed.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the court.

Pursuant to 28 U.S.C. §1746, I do hereby certify under penalty of perjury, that the foregoing statements are true and correct.

Executed in ___Potomac___, Maryland on this 23rd day of August, 2013.

_____
Eileen Joseph

## CERTIFICATION OF DANIEL WISHNATSKY

Plaintiff, Daniel Wishnatsky, hereby certifies as follows pursuant to the Private Securities Litigation Reform Act of 1995:

1.      I have reviewed the Complaint in Joseph, et al. v. Bureau of National Affairs, Inc. et al. and authorized its filing.

2.      I did not purchase the security that is the subject of the Complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934, 15 U.S.C. 78a et seq.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      My transactions concerning the security that is the subject of the Complaint during the Class Period specified in the Complaint is as follows: I sold 300 shares of BNA Company Stock through the SPTP on or about March 25, 2011, 700 shares of BNA Company Stock through the SPTP on or about April 19, 2011, and 500 shares of BNA Company Stock through the SPTP on or about July 11, 2011.

5.      I have not sought to serve, or served, as a representative party on behalf of a class during the 3-year period preceeding the date on which this certification is filed.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the court.

Pursuant to 28 U.S.C. §1746, I do hereby certify under penalty of perjury, that the foregoing statements are true and correct.

Executed in Phoenix, Arizona on this 22 day of August, 2013.

Daniel Wishnatsky